STATE OF NORTH CAROLINA v. ROGER McKINLEY BLAKENEY

No. 203A98

(Filed 13 July 2000)

**1. Jury— selection—capital trial—representation of African-American citizens**

The trial court did not err in a capital first-degree murder prosecution by denying defendant's written and oral motions to dismiss the jury venire based on an alleged underrepresentation of African-American citizens where defendant's contention was that affirmative efforts should have been made to ensure that the jury venire was racially proportionate rather than that the selection process involved systematic exclusion, with the argument based upon the venire that actually reported for service rather than the venire summoned. Defendant's showing of a 7.85 percent difference between African-Americans in the county's population and the venire that actually reported does not render the venire

constitutionally infirm; moreover, defendant does not argue, and there is no evidence, that the statutory scheme in N.C.G.S. § 9-2 was not followed or that the selection process otherwise failed to be racially neutral.

**2. Jury— selection—capital trial—questionnaire—contact with other races**

The defendant in a first-degree murder prosecution did not show that the trial court abused its discretion or that he was otherwise prejudiced by a ruling deleting from a jury questionnaire a question concerning prospective jurors' contacts with people of other races. Defendant did not demonstrate that the ruling was arbitrary or that he was prohibited from asking prospective jurors the question.

**3. Jury— selection—capital trial—death penalty views**

The trial court did not abuse its discretion during jury selection in a first-degree murder prosecution by excusing two jurors based on their opposition to the death penalty where their responses to questions revealed that their views of the death penalty would prevent or substantially impair the performance of their duties at trial and that they could not temporarily set aside their own beliefs and agree to follow the law or the court's instructions.

**4. Jury— selection—capital trial—rehabilitation**

The trial court did not abuse its discretion during jury selection in a first-degree murder prosecution by refusing to allow defense counsel to rehabilitate jurors where defendant failed to show that any questioning on his part would have produced different answers.

**5. Jury— selection—capital trial—newspaper articles—motion for continuance**

A first-degree murder defendant's right to an impartial jury was not violated by the trial court's denial of his pretrial motion for a continuance where defendant contended that the jury pool was tainted by two newspaper articles which incorrectly identified him as a convicted felon on parole at the time of the crime. The only juror who admitted reading an article at issue served as an alternate and did not participate in jury deliberations. No juror who participated was exposed to the challenged article and all three jurors who admitted reading newspaper articles about the case indicated that they could set aside what they had read.

## 6. Constitutional Law— presence at capital trial—post-trial evidentiary findings

A first-degree murder defendant's right to be present at his trial was not violated where the transcript did not indicate whether defendant was present at a post-trial proceeding at which the trial court made findings of fact and conclusions of law supporting oral evidentiary rulings made during trial. Assuming that defendant was not present, there was no prejudicial error because any objections to the findings and conclusions will be considered on appeal as fully as if defendant had specifically objected at the time they were entered; the judge's findings appear to be his own considered determinations based upon evidence presented during the suppression hearing at trial, although he confirmed his findings with the prosecutor and an SBI agent; and the findings are supported by competent evidence.

## 7. Constitutional Law— presence at capital trial—bench conferences

A first-degree murder defendant's right to be present at his capital trial was not violated by bench conferences where defendant was represented by counsel at each conference, defendant was present in the courtroom, and defendant failed to demonstrate that the challenged bench conferences implicated defendant's confrontation rights or that his presence would have had a reasonably substantial relation to his opportunity to defend.

## 8. Criminal Law— recordation—bench conferences

The right of a first-degree murder defendant to recordation under N.C.G.S. § 15A-1241 was not violated by unrecorded bench conferences where defendant never requested that the subject matter of a bench conference be reconstructed for the record. Appellate review is facilitated by the trial court's rulings, not the arguments of counsel during a bench conference, and the substance of the challenged rulings in this case is apparent based on the resulting admission of evidence.

## 9. Criminal Law— recordation—dismissal of juror—appellate review

The lack of recordation of a bench conference preceding dismissal of a prospective juror during jury selection for a first-degree murder prosecution did not inhibit defendant's ability to argue or the Supreme Court's ability to review whether the trial

counsel's failure to make a Batson objection constituted ineffective assistance of counsel. The transcript of proceedings contained sufficient information to determine whether a *Batson* challenge should have been made and defendant did not demonstrate (nor does the record reveal) that a prima facie case of racial discrimination in jury selection could be made in this case.

## 10. Evidence— photographs—videotape—crime scene

The trial court did not abuse its discretion in a first-degree murder prosecution by admitting photographs and a videotape of the victim and the crime scene where the challenged photographs and videotape were not used excessively and solely to inflame the passions of the jury; the photographs and the portions of the videotape which the court found to be repetitive and nonprobative were excluded; each photograph illustrated a unique aspect of the manner in which the victim was killed; the videotape uniquely depicted the condition and location of the victim's body in the context of the crime scene; and the photographs and videotape illustrated the testimony of the SBI agent who conducted the crime scene search and the testimony of the pathologist who performed the autopsy.

## 11. Witnesses— expert—SBI agent—burning of home

The trial court did not err in a first-degree murder prosecution by admitting the testimony of an SBI arson investigator that the burning of the victim's home was of incendiary origin. The agent had sufficient knowledge to form an opinion, his testimony concerned matters which are not within the knowledge of the average person, and his testimony was helpful to the jury.

## 12. Homicide— first-degree murder—district attorney's discretion to prosecute—lack of discretion to try capitally— no constitutional conflict

There is no constitutional conflict between a district attorneys's discretion to try a homicide defendant for first-degree murder, second-degree murder, or manslaughter, and the lack of discretion to try a first-degree murder defendant capitally or noncapitally. N.C.G.S. § 15A-2000.

## 13. Homicide— choice of first-degree murder or lesser crime— district attorney's discretion

A district attorney's discretion to determine whether to try a homicide defendant for first-degree murder or for a lesser crime

STATE v. BLAKENEY

[352 N.C. 287 (2000)]

does not render N.C.G.S. § 15A-2000 unconstitutional. There is no evidence that the district attorney's decision to prosecute defendant for first-degree murder was based on any improper factor such as race, religion, or other arbitrary classification.

### 14. Homicide— first-degree murder—instructions—circumstantial evidence

There was no plain error in a first-degree murder prosecution where the court instructed the jury that it could rely on circumstances surrounding the murder to infer premeditation and deliberation. The instruction given was based upon the pattern jury instruction and prior cases have found no error in nearly identical instructions.

### 15. Evidence— flight—evidence sufficient

There was sufficient evidence in a first-degree murder prosecution to warrant an instruction on flight where defendant telephoned his wife from his mother's residence before the victim arrived and told her he would be home in a few minutes; defendant instead left the area in his vehicle; a longstanding friend waved at him, but he did not respond; he drove to a "shack in the country" to trade the victim's gun for cocaine and cash; he continued to drive through the country, trading more stolen items for drugs; and he went to another friend's house, where he was apprehended.

### 16. Sentencing— capital—evidence—scene of prior crime

The trial court did not abuse its discretion in a first-degree murder sentencing proceeding by admitting testimony from the victim of a prior armed robbery and photographs of the crime scene showing blood. The Rules of Evidence do not apply in capital sentencing proceedings; moreover, the probative value of the evidence was not outweighed by the prejudice because the photographs illustrated the testimony and both the testimony and the photographs were relevant to an aggravating circumstance.

### 17. Sentencing— capital—nonstatutory mitigating circumstance—not submitted

There was no prejudicial error in a capital sentencing proceeding where the court erroneously refused to submit a proposed nonstatutory mitigating circumstance that was supported by defendant's statements to authorities and which a reasonable juror could find to have mitigating value, but defendant's state-

ment was read to the jury, the evidence underlying the circumstance was fully argued to the jury by defense counsel, the catchall mitigating circumstance was argued to the jury, and the error did not preclude any juror from considering and giving weight to any evidence underlying the proposed circumstance.

**18. Sentencing— capital—mitigating circumstances—no significant history of criminal activity**

The trial court did not err in a capital sentencing proceeding by submitting the statutory mitigating circumstance that defendant had no significant history of criminal activity, N.C.G.S. § 15A-2000(f)(1), where defendant had a conviction for robbery with a dangerous weapon and a history of drug abuse.

**19. Sentencing— capital—mitigating and aggravating circumstances—no significant history of criminal activity—prior conviction involving violence—both submitted**

The trial court did not err during a capital sentencing proceeding by submitting the no significant history of criminal activity mitigating circumstance, N.C.G.S. § 15A-2000(f)(1), after having submitted the aggravating circumstance that defendant had a prior felony conviction involving violence, N.C.G.S. § 15A-2000(e)(3).

**20. Sentencing— capital—instructions—result of unanimous recommendation**

The trial court did not err in a capital sentencing proceeding by granting the State's motion to prohibit defendant from arguing to the jury that the failure to agree on punishment would result in life imprisonment and then instructing the jury that the defendant would be sentenced to death if they unanimously recommended death and sentenced to life if they unanimously recommended life. The instruction was in accord with N.C.G.S. § 15A-2002 and it has been held that it is improper for a trial court to inform the jury of the effect of its failure to reach a unanimous verdict.

**21. Criminal Law— prosecutor's argument—not improper**

The argument of the prosecutor in a capital sentencing proceeding was not so grossly improper as to require the court to intervene ex mero motu where defendant contended that the prosecutor made false and improper statements regarding a clinical psychologist who testified for defendant, but the prosecutor did not travel outside the record.

**22. Criminal Law— prosecutor's argument—preparation of defense psychologist's report**

There was no error so grossly improper that the court was required to intervene ex mero motu in the prosecutor's argument in a capital sentencing proceeding where the prosecutor argued that a psychiatrist's report was prepared at the last moment to surprise the prosecution, that defense counsel had prepared the report, and that the diagnosis was taken from a manual. The argument concerning the psychiatrist's motive was a permissible inference from the evidence, there was testimony that the psychiatrist had dictated tapes and sent them to defense counsel to be typed, and the psychiatrist testified that he relied in part on the DSM.

**23. Sentencing— capital—death penalty not disproportionate**

A sentence of death for a first-degree murder was not imposed under the influence of passion, prejudice, or any other arbitrary factor; the record supports the aggravating circumstances found by the jury; and the sentence was not disproportionate. Defendant was convicted based upon premeditation and deliberation and the jury found the prior violent felony aggravating circumstance, this case is more similar to those where the death penalty was found proportionate than to those where it was found disproportionate, and, based upon the characteristics of the defendant and the crime, the Supreme Court was convinced that the sentence was not disproportionate.

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Helms (William H.), J., on 10 September 1997 in Superior Court, Union County, upon a jury verdict finding defendant guilty of first-degree murder. The Supreme Court, on 26 May 1998, allowed defendant's motion to bypass the Court of Appeals as to his appeal of additional judgments. Heard in the Supreme Court 13 October 1998.

*Michael F. Easley, Attorney General, by William N. Farrell, Jr., Senior Deputy Attorney General, for the state.*

*Marilyn G. Ozer and William F.W. Massengale for defendant-appellant.*

MARTIN, Justice.

On 13 May 1996 defendant Roger McKinley Blakeney (defendant) was indicted for the first-degree murder of Callie Washington Huntley (the victim). Defendant was also indicted for arson, common law robbery, felonious breaking and entering, felonious larceny, and felonious possession of stolen goods. Defendant was tried capitally at the 25 August 1997 Criminal Session of Superior Court, Union County. At the close of the evidence, the state voluntarily dismissed the larceny charge. In addition, the charge of felonious possession of stolen goods was not submitted to the jury. The jury found defendant guilty of first-degree murder on the basis of malice, premeditation, and deliberation and under the felony murder rule. The jury also found defendant guilty of first-degree arson, common law robbery, and felonious breaking and entering. Following a capital sentencing proceeding, the jury recommended a sentence of death for the first-degree murder conviction, and the trial court entered judgment in accordance with that recommendation. The trial court also entered judgments sentencing defendant to consecutive terms of imprisonment for the remaining convictions.

The state presented evidence at trial which is summarized as follows: On 15 April 1996, between the hours of 10:00 a.m. and 12:00 noon, defendant, age thirty-three, opened and crawled through a back window in his mother's home for the purpose of stealing something of value that he could sell. Defendant stole three of his mother's rings, a brown leather pouch, approximately $4.00 in change, a small herringbone chain, and his mother's savings account deposit book. Defendant then telephoned his wife and told her he would be home in a few minutes.

After defendant finished speaking with his wife, the victim, age seventy-six, drove behind the house. The victim had lived with defendant's mother for over twenty years. Defendant hid in a small room behind the refrigerator as the victim entered the residence. According to defendant's confession, which was admitted into evidence at trial, defendant entered the kitchen, and the two began arguing. Defendant told authorities that he turned to leave, but the victim grabbed him. Defendant charged at the victim, grabbed and wrestled a .22-caliber revolver out of the victim's hand, and hit the victim in the back of the head with the butt of the gun. The victim fell facedown on the kitchen floor and started bleeding. According to defendant, after some additional period of physical struggle, a metal can of kerosene was accidentally spilled. Defendant also claimed

that a cigarette he was smoking fell out of his mouth at some time during the struggle. According to defendant, at some point, he pulled the victim off the floor, sat him in a chair, and wrapped an electrical cord around his hands and legs. Defendant then removed $78.00 from the victim's wallet, exited the residence, and departed the area in defendant's vehicle.

Terry Lee Bivens (Bivens), defendant's longstanding friend, worked at a nearby business and observed defendant departing his mother's residence on the day in question. Bivens recognized defendant's vehicle. Seconds later, Bivens noticed smoke coming from the residence. Bivens and several other witnesses looked on as the house began to burn.

Firefighters arrived at the scene and discovered the victim's wire-bound body as they fought the fire. Agent Van Worth Shaw, Jr. (Agent Shaw), an arson investigator for the State Bureau of Investigation (SBI), determined that the fire had two distinct points of origin and was caused by the use of a flammable liquid. In contrast to defendant's statement, all accidental causes were eliminated during the investigation, and Agent Shaw opined that the fire was intentionally set. The investigation revealed traces of kerosene on samples taken from the couch in the den and on the victim's clothing.

Dr. Robert Thompson, a forensic pathologist with the Office of the Chief Medical Examiner, performed an autopsy on the victim's body. The autopsy revealed that seventy-five percent of the victim's skin was charred. Dr. Thompson also observed that the victim had received a wound to the back and a wound to the left temporal area of the head, which resulted in injury to the brain. Dr. Thompson opined that the victim was conscious for approximately three to five minutes after the fire started, that the victim died within approximately ten minutes, and that the cause of death was carbon monoxide poisoning produced by the fire.

On 16 April 1996 law enforcement officers located defendant at a friend's residence, sitting in the passenger seat of his vehicle. Defendant consented to a search of his vehicle, where the officers found his mother's stolen jewelry, leather pouch, and savings deposit book in the glove compartment. The authorities later recovered the .22-caliber revolver that defendant had taken from the victim. Defendant had exchanged the gun for a loan. The investigation also revealed that bloodstains found on defendant's clothing were consistent with the victim's blood.

Defendant did not present evidence during the guilt-innocence phase of trial.

Additional facts will be provided as necessary to discuss specific issues pertaining to defendant's assignments of error.

## JURY SELECTION

**[1]** By assignment of error, defendant contends the trial court erred in denying his written and oral motions to dismiss the jury venire based on an alleged underrepresentation of African-American citizens. Defendant does not argue that the jury selection process in this case involved systematic exclusion of African-Americans from the jury pool. Rather, defendant contends that affirmative efforts should have been made to ensure that the jury venire called for his trial was racially proportionate.

Defendant attached a copy of the 1994 census for Union County in support of his written motion to dismiss the venire. The census revealed that African-Americans comprised 16.15% of the county's population. Defendant does not state, and the record does not otherwise indicate, the percentage of African-Americans that were represented in the venire summoned for jury service. Rather, defendant bases his argument on the venire that actually reported for jury service.

The venire that actually reported for jury service consisted of 8.3% African-Americans. Defendant argues that the difference between the percentage of African-Americans in the general population compared to the venire, without more, violated his constitutional right to have a jury drawn from a venire representative of the community.

A criminal defendant has a constitutional right to be tried by a jury of his or her peers. U.S. Const. amend. VI; N.C. Const. art. I, §§ 24, 26. "This constitutional guarantee assures that members of a defendant's 'own race have not been systematically and arbitrarily excluded from the jury pool which is to decide [his] guilt or innocence.' " *State v. Bowman*, 349 N.C. 459, 467, 509 S.E.2d 428, 434 (1998) (quoting *State v. McNeill*, 326 N.C. 712, 718, 392 S.E.2d 78, 81 (1990)), *cert. denied*, —— U.S. ——, 144 L. Ed. 2d 802 (1999). The Sixth Amendment does not, however, "guarantee[] the defendant the right to a jury composed of members of a certain race or gender." *State v. Norwood*, 344 N.C. 511, 527, 476 S.E.2d 349, 355 (1996), *cert. denied*, 520 U.S. 1158, 137 L. Ed. 2d 500 (1997).

**STATE v. BLAKENEY**

[352 N.C. 287 (2000)]

To establish a *prima facie* case of disproportionate representation in a venire, a defendant must show:

(1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364, 58 L. Ed. 2d 579, 587 (1979); *see Bowman*, 349 N.C. at 467-68, 509 S.E.2d at 434; *State v. McNeill*, 326 N.C. 712, 717, 392 S.E.2d 78, 81 (1990); *State v. McCoy*, 320 N.C. 581, 583, 359 S.E.2d 764, 765 (1987).

The state does not dispute that the first prong of the *Duren* test has been satisfied. Rather, the dispositive issue is whether defendant has established the second and third prongs.

The second prong of the *Duren* test requires us to determine whether the representation of African-Americans in the venire was fair and reasonable. 439 U.S. at 364, 58 L. Ed. 2d at 587. This Court has previously addressed cases in which similar census data was presented as a basis for alleged underrepresentation of African-Americans in the venire. *See Bowman*, 349 N.C. at 468, 509 S.E.2d at 434; *State v. Price*, 301 N.C. 437, 447, 272 S.E.2d 103, 110 (1980). The disputed evidence in *Bowman* revealed that African-Americans made up 23% of the summoned jury pool, while the county's population was 39.17% African-American, a difference of 16.17%. *See Bowman*, 349 N.C. at 467-68, 509 S.E.2d at 433-34. Upon reviewing that data, this Court stated, "[W]e cannot conclude that this figure, standing alone, is unfair or unreasonable." *Id.* at 468, 509 S.E.2d at 434.

Similarly, in *Price*, the evidence showed that African-Americans made up 17.1% of the jury pool, while the county's population was 31.1% African-American, a difference of 14%. *Price*, 301 N.C. at 447, 272 S.E.2d at 110. Based on that data, this Court stated, "[W]e are unable to conclude as a matter of law that the applicable percentages are sufficient to establish that the representation of [African-Americans] is not fair and reasonable in light of their presence in the community." *Id.*

In the instant case, the record discloses that the statistical variation alleged by defendant is comparable to that presented in *Bowman* and *Price*. Therefore, under our precedent, defendant's

showing of a 7.85% difference, standing alone, does not render the jury venire constitutionally infirm.

The third prong of the *Duren* test requires us to determine whether the alleged underrepresentation of African-Americans is because of systematic exclusion in the jury selection process. *See* 439 U.S. at 364, 58 L. Ed. 2d at 587. As noted above, defendant does not argue before this Court that the jury selection process in this case involved the systematic exclusion of African-Americans from the jury pool. Rather, defendant contends that affirmative efforts should have been made to ensure that the jury venire was racially proportionate.

We note that N.C.G.S. § 9-2, which governs the selection of the jury pool, "has been expressly recognized as providing 'a system for objective selection of veniremen.' " *McNeill*, 326 N.C. at 718, 392 S.E.2d at 82 (quoting *State v. Avery*, 299 N.C. 126, 133, 261 S.E.2d 803, 807 (1980)). In this case, there is no evidence, and defendant does not argue, that the statutory scheme set out in N.C.G.S. § 9-2 was not followed or that the selection process otherwise failed to be racially neutral. Moreover, "defendant . . . is not entitled to a jury of any particular composition, nor is there any requirement that the jury actually chosen must mirror the community and reflect various and distinctive population groups." *State v. Avery*, 299 N.C. 126, 130, 261 S.E.2d 803, 806 (1980). Therefore, this assignment of error is overruled.

**[2]** In his next assignment of error, defendant contends the trial court erred in deleting a question from the jury questionnaire concerning the prospective jurors' contacts with people of other races.

It is well settled that "[r]egulation of the manner and extent of the inquiry of prospective jurors concerning their fitness rests largely in the discretion of the trial court, and such regulation will not be found to constitute reversible error absent a showing of an abuse of discretion." *State v. Fisher*, 336 N.C. 684, 693-94, 445 S.E.2d 866, 871 (1994), *cert. denied*, 513 U.S. 1098, 130 L. Ed. 2d 665 (1995); *accord State v. Lyons*, 340 N.C. 646, 667, 459 S.E.2d 770, 782 (1995); *State v. McLamb*, 313 N.C. 572, 575, 330 S.E.2d 476, 478 (1985). The trial court may be reversed for an abuse of discretion "only upon a showing that its ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. Allen*, 322 N.C. 176, 189, 367 S.E.2d 626, 633 (1988).

In the instant case, defendant has not demonstrated that the trial court's ruling was arbitrary. Moreover, defendant has not shown that

he was in any way prohibited from asking prospective jurors the same question that was deleted from the questionnaire. *See Fisher*, 336 N.C. at 694, 445 S.E.2d at 871; *Lyons*, 340 N.C. at 667-68, 459 S.E.2d at 782. Defendant has therefore failed to show that the trial court abused its discretion or that he was otherwise prejudiced by the trial court's ruling. Accordingly, this assignment of error fails.

**[3]** By defendant's next assignment of error, he contends the trial court erred by excusing two jurors for cause based on their opposition to the death penalty.

The standard for determining whether a prospective juror may be excused for cause because of that juror's views on capital punishment is whether those views "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)). Prospective jurors in a capital case are properly excused if they are unable to " 'state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.' " *State v. Brogden*, 334 N.C. 39, 43, 430 S.E.2d 905, 908 (1993) (quoting *Lockhart v. McCree*, 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149-50 (1986)).

We have recognized that "a prospective juror's bias for or against the death penalty cannot always be proven with unmistakable clarity." *State v. Miller*, 339 N.C. 663, 679, 455 S.E.2d 137, 145, *cert. denied*, 516 U.S. 893, 133 L. Ed. 2d 169 (1995). Therefore, we must "defer to the trial court's judgment as to whether the prospective juror could impartially follow the law." *State v. Morganherring*, 350 N.C. 701, 726, 517 S.E.2d 622, 637 (1999), *cert. denied*, —— U.S. ——, 146 L. Ed. 2d 322 (2000). The trial court's decision to excuse a juror is discretionary and will not be disturbed absent an abuse of discretion. *See State v. Smith*, 351 N.C. 251, 261, 524 S.E.2d 28, 36 (2000); *Morganherring*, 350 N.C. at 726, 517 S.E.2d at 637; *State v. Jaynes*, 342 N.C. 249, 270, 464 S.E.2d 448, 461 (1995), *cert. denied*, 518 U.S. 1024, 135 L. Ed. 2d 1080 (1996).

In the case at hand, prospective jurors George Crawford (G. Crawford) and Jane Austin (Austin) both responded affirmatively when the prosecutor asked whether they had any moral, religious, or personal beliefs against the death penalty. G. Crawford told the prosecutor that it was not his responsibility to sentence someone to death and that he did not want to make that decision. He further stated that

he could not decide guilt or innocence. Finally, G. Crawford indicated that he did not want to participate at all in a process that may call for imposition of the death penalty. These responses reveal that G. Crawford's views of the death penalty would prevent or substantially impair the performance of his duties at trial. Further, G. Crawford's responses clearly demonstrated that he could not temporarily set aside his own beliefs about the death penalty and agree to follow the law. Therefore, the trial court did not abuse its discretion by excusing him for cause.

During *voir dire* of Austin, she initially indicated that her views of the death penalty would "probably" prevent her from being able to decide guilt or innocence knowing that it may result in imposition of the death penalty. When asked whether she would be inclined to vote against the death penalty in all cases regardless of the facts and circumstances, Austin responded, "Probably I would have some reservations there. Circumstances involving children or extended torture of a victim before death. In certain circumstances maybe I would vote for the death penalty. Not as a rule all of the way across the board." The prosecutor then asked, "Should the evidence in this case not meet what's in your mind . . . would you be unable to follow the law the Court gives you as to what the appropriate punishment would be?" Austin replied, "Probably." When the prosecutor restated the question and asked once again whether Austin would be unable to follow the law, Austin replied, "I think so." Based on that response, the trial court questioned Austin as follows:

THE COURT: Are you saying, ma'am, that you're going to substitute your own personal beliefs as to what's appropriate rather than what the law of the state [sic]? Is that correct?

JANE AUSTIN: Well, if I sit here in the jury and if I stay and you told me to do this and that and the other, or I have to vote either or, which you have outlined, I don't think I could vote for. I'd have to vote for the whatever you said, life imprisonment.

THE COURT: So you believe that you're going to follow your own personal convictions?

JANE AUSTIN: Yes, sir. I have to.

THE COURT: Okay. I understand that. It's not a criticism of you, but—

JANE AUSTIN: I know.

STATE v. BLAKENEY

[352 N.C. 287 (2000)]

THE COURT: The question becomes if it's a choice between following the law as I give it to you and your own personal convictions, you're going to follow your own personal convictions?

JANE AUSTIN: Oh, yes, sir.

Following this exchange, Austin was excused for cause.

Austin's responses reveal that her views of the death penalty would interfere with her ability to decide guilt or innocence in a capital case. Further, Austin was unable to set aside her personal beliefs and follow the trial court's instructions. Indeed, Austin expressly stated that she would follow her own personal beliefs concerning the death penalty rather than the trial court's instructions. Therefore, the trial court did not abuse its discretion in excusing Austin for cause.

[4] Further, we reject defendant's argument that the trial court abused its discretion by refusing to allow defense counsel the opportunity to rehabilitate G. Crawford, Austin, and twelve other unnamed jurors. The trial court does not abuse its discretion by refusing to allow a defendant an attempt to rehabilitate a juror unless the defendant can show that further questions would have produced different answers by the juror. *See State v. Cummings*, 346 N.C. 291, 313, 488 S.E.2d 550, 563 (1997), *cert. denied*, 522 U.S. 1092, 139 L. Ed. 2d 873 (1998); *Brogden*, 334 N.C. at 44, 430 S.E.2d at 908. Both G. Crawford and Austin expressed their inability, based on their views of the death penalty, to properly perform the duties of a juror in a capital case. Moreover, defendant has failed to show that any questioning on his part would have produced different answers from any juror. Accordingly, this assignment of error is rejected.

[5] In his next assignment of error, defendant contends his constitutional right to an impartial jury was violated by the trial court's denial of his pretrial motion for a continuance. Defendant's motion was based upon two newspaper articles published prior to trial, which defendant claims incorrectly identified him as a convicted felon on parole at the time of the murder. Defendant claims that the newspaper articles tainted the jury pool and, therefore, that his constitutional rights were violated by the trial court's denial of the motion.

A motion for a continuance is ordinarily addressed to the sound discretion of the trial court, and the ruling will not be disturbed absent a showing of abuse of discretion. *See State v. Beck*, 346 N.C. 750, 756, 487 S.E.2d 751, 755 (1997); *State v. Poole*, 305 N.C. 308, 318, 289 S.E.2d 335, 341 (1982). When a motion to continue raises a con-

stitutional issue, however, the trial court's ruling thereon involves a question of law that is fully reviewable on appeal by examination of the particular circumstances presented in the record. *See State v. Branch*, 306 N.C. 101, 104, 291 S.E.2d 653, 656 (1982); *see also State v. Jones*, 342 N.C. 523, 530-31, 467 S.E.2d 12, 17 (1996). Even when the motion raises a constitutional issue, denial of the motion is grounds for a new trial only upon a showing that "the denial was erroneous and also that [defendant] was prejudiced as a result of the error." *Branch*, 306 N.C. at 104, 291 S.E.2d at 656.

In the present case, only three jurors who served on defendant's jury stated that they had read a newspaper article about the case. The record reveals that jurors Vicki Turman and Sammy Bryant had not read either of the articles that were the subject of defendant's motion for a continuance. Juror Julie Brown (Brown) admitted that she had read an article about defendant in the newspaper at issue in this case. The record indicates, however, that Brown served as an alternate juror and did not participate in jury deliberations. Thus, no juror that participated in jury deliberations in this case was exposed to the challenged article. Moreover, all three jurors indicated during *voir dire* that they could set aside what they had read and decide the case based solely on the evidence and law presented at trial. Therefore, defendant has failed to demonstrate that he was prejudiced by the trial court's denial of his motion for a continuance or that the trial court abused its discretion. This assignment of error is without merit.

## GUILT-INNOCENCE PHASE

[6] In his next assignment of error, defendant complains of a proceeding in which the trial court made findings of fact and conclusions of law in support of its ruling at trial on several of defendant's pretrial motions to suppress evidence. Defendant alleges that the transcript does not reveal whether he or his counsel were present at this proceeding. Therefore, defendant argues, the proceeding violated his right to presence under the Sixth Amendment to the United States Constitution and Article I, Section 23 of the North Carolina Constitution.

After an evidentiary hearing during trial, the trial court orally denied defendant's motions to suppress his written confession to the police, his blood sample, and evidence obtained from the search of defendant's automobile. The trial judge indicated he would dictate an order for the record at a later time.

STATE v. BLAKENEY

[352 N.C. 287 (2000)]

The trial judge began the challenged proceeding by announcing his intention to make findings of fact. He started his findings by explaining that defendant was personally present in open court with his attorneys when an evidentiary hearing was held in the absence of the jury. The trial judge interrupted his findings to state to those present, "y'all follow this as I go along so if there [sic] any corrections or anything, speak up so I can address it as I come to it." The trial court then proceeded to make findings of fact based on the evidence presented at trial.

As the trial court announced findings relevant to the admissibility of defendant's confession, the following exchange occurred:

THE COURT: . . . That Detective Underwood told [defendant] that he was not under arrest, that he just wanted to talk to him. Is that right now? Detective Underwood told him that?

[PROSECUTOR]: Yes.

At another time, the trial court announced its findings concerning a blood sample taken from defendant, and the following exchange occurred:

THE COURT: . . . That thereafter a consent form was written for purposes of taking a blood sample from the defendant, and that the defendant signed it.

The next morning he signed it, is that correct?

[AGENT] UNDERWOOD: Yes, sir.

The trial judge then completed his findings and recited his conclusions of law for the record.

In a capital case, the defendant has a nonwaivable right to be present at every stage of the proceeding. *See* N.C. Const. art. I, § 23; *State v. Atkins*, 349 N.C. 62, 101, 505 S.E.2d 97, 121 (1998), *cert. denied*, 526 U.S. 1147, 143 L. Ed. 2d 1036 (1999). "This constitutional mandate serves to safeguard both defendant's and society's interests in reliability in the imposition of capital punishment." *Id.*; *see State v. Huff*, 325 N.C. 1, 30, 381 S.E.2d 635, 651 (1989), *sentence vacated on other grounds*, 497 U.S. 1021, 111 L. Ed. 2d 777 (1990).

In the instant case, defendant apparently relies on the lack of any indication in the record that he was present to establish that he was in fact absent. This Court has held, however, that " 'whatever incompleteness may exist in the record precludes defendant from showing

that error occurred.' " *State v. Daughtry*, 340 N.C. 488, 517, 459 S.E.2d 747, 762 (1995) (quoting *State v. Adams*, 335 N.C. 401, 410, 439 S.E.2d 760, 764 (1994)), *cert. denied*, 516 U.S. 1079, 133 L. Ed. 2d 739 (1996). As in *Daughtry*, the transcript in this case "does not indicate, and defendant has not shown, that he was absent. We will not assume error 'when none appears on the record.' " *Id.* (quoting *State v. Williams*, 274 N.C. 328, 333, 163 S.E.2d 353, 357 (1968)). Nonetheless, we note that the better practice is for the trial court to expressly indicate on the record whether the parties and their counsel are present during trial proceedings.

Assuming *arguendo* that defendant was not present at the challenged post-trial proceeding, the trial court nonetheless committed no prejudicial error. This Court has held that a trial court does not commit prejudicial error by dictating findings of fact and conclusions of law into the record after entry of judgment and without the presence of a capital defendant or his counsel. *See State v. Richardson*, 295 N.C. 309, 320, 245 S.E.2d 754, 761-62 (1978); *see also State v. Rich*, 346 N.C. 50, 55-56, 484 S.E.2d 394, 398, *cert. denied*, 522 U.S. 1002, 139 L. Ed. 2d 412 (1997); *State v. Horner*, 310 N.C. 274, 278-79, 311 S.E.2d 281, 285 (1984). As we stated in *Richardson*, "[a]ny objections defendant wished to make to the findings of fact and conclusions of law which the trial court belatedly entered . . . will be considered by appellate courts of this State just as fully as if defendant had specifically objected to the findings or conclusions at the time they were entered." 295 N.C. at 320, 245 S.E.2d at 761-62.

We further conclude the trial court did not commit prejudicial error by confirming its findings of fact with the prosecutor and Agent Underwood during the challenged proceeding. Although it is the better practice for the trial court to make its findings of fact independently, the trial court's findings are nonetheless binding on appeal if supported by competent evidence. *See State v. Hipps*, 348 N.C. 377, 395, 501 S.E.2d 625, 636 (1998), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 114 (1999).

In the present case, the challenged proceeding was conducted *after* the trial court had already conducted an evidentiary hearing outside the presence of the jury and ruled on defendant's suppression motions in open court. Prior to announcing his findings, the trial judge explained that he "had an opportunity to see and observe each witness to determine what weight and credibility to give to each of the witness' [sic] testimony." The trial judge's findings therefore appear to represent his own considered determinations based on evi-

dence presented at the suppression hearing during trial. Moreover, assuming error *arguendo*, our review of the record reveals, and defendant does not argue otherwise, that the trial court's findings of fact are supported by competent evidence. *See Richardson*, 295 N.C. at 320, 245 S.E.2d at 761-62. Therefore, the comments by the prosecutor and Agent Underwood did not prejudice defendant. Accordingly, defendant's argument is without merit.

[7] Defendant next contends that the trial court erred in holding various unrecorded bench conferences during his capital trial at which defendant was not personally present. Although present in the courtroom and represented by counsel at the conferences, defendant nonetheless contends his absence from the bench conferences violated his constitutional right to be present at every stage of the capital proceeding.

Defendant complains of one such unrecorded bench conference in particular. During the *voir dire* of prospective juror Robert Crawford (R. Crawford), the prosecutor began his examination with questions concerning R. Crawford's beliefs on the death penalty, his ability to follow the law, and his personal knowledge about the case and defendant. R. Crawford expressed reservations about his ability to follow the trial court's instructions because of his educational background in criminal justice. As the prosecutor continued to question R. Crawford, the following exchange occurred:

[PROSECUTOR]: His attorneys are within the court here this afternoon, of course. Do you know either Mr. Bob Huffman personally or—

THE COURT: Approach the bench.

(Conference at the bench.)

[PROSECUTOR]: Your Honor, the State with its thanks would excuse Mr. Crawford.

THE COURT: All right, thank you, sir. You're free to leave.

No objection to R. Crawford's dismissal appears in the record.

This Court has repeatedly held that a defendant's constitutional right "to be present at all stages of his capital trial is not violated when, with defendant present in the courtroom, the trial court conducts bench conferences, even though unrecorded, with counsel for both parties." *State v. Buchanan*, 330 N.C. 202, 223, 410 S.E.2d 832,

845 (1991); *accord State v. White*, 349 N.C. 535, 545, 508 S.E.2d 253, 260 (1998), *cert. denied*, 527 U.S. 1026, 144 L. Ed. 2d 779 (1999); *State v. Speller*, 345 N.C. 600, 605, 481 S.E.2d 284, 286 (1997); *State v. Cummings*, 332 N.C. 487, 496-98, 422 S.E.2d 692, 697-98 (1992). We have stated that "bench conferences typically concern legal matters with which an accused is likely unfamiliar and incapable of rendering meaningful assistance." *Buchanan*, 330 N.C. at 223, 410 S.E.2d at 845. The defendant's presence in the courtroom allows him to "observe the context of each conference," and the presence of counsel at the bench conference provides the defendant with "constructive knowledge of all that transpired." *Id.* at 223, 410 S.E.2d at 844. A defendant's constitutional right of presence is violated, however, if "the subject matter of the conference implicates the defendant's confrontation rights, or is such that the defendant's presence would have a reasonably substantial relation to his opportunity to defend." *Id.* at 223-24, 410 S.E.2d at 845.

In the instant case, our review of the transcript reveals that defendant was represented by counsel at each of the challenged bench conferences. Defendant was also present in the courtroom during each conference. Moreover, defendant has failed to demonstrate, and the record does not in any way suggest, that the challenged bench conferences implicated defendant's confrontation rights or that his presence would have had a reasonably substantial relation to his opportunity to defend. As in *Speller*, defendant "was in a position to observe the context of the conferences and to inquire of his attorneys as to the nature and substance of each one." 345 N.C. at 605, 481 S.E.2d at 286. Likewise, defendant "had a firsthand source as to what transpired, and defense counsel had the opportunity and obligation to raise for the record any matter to which defendant took exception." *Id.* at 605, 481 S.E.2d at 286-87. Therefore, defendant's state and federal constitutional right to presence was not violated by the challenged bench conferences.

[8] Defendant next argues that the unrecorded bench conferences violated his statutory right to recordation under N.C.G.S. § 15A-1241 and deprived him of his constitutional right to due process by rendering appellate review impossible. Specifically, defendant contends it is impossible for this Court to meaningfully review evidentiary rulings that were addressed in unrecorded bench conferences. Defendant also hypothesizes that the dismissal of prospective juror R. Crawford *may* have been the result of racially discriminatory jury selection in violation of *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d

69 (1986). Defendant contends, however, that the lack of recordation of the bench conference which preceded that dismissal has deprived him of the ability to demonstrate on appeal that his counsel's failure to make a *Batson* objection constitutes ineffective assistance of counsel.

This Court has repeatedly held that section 15A-1241 does not require recordation of "private bench conferences between trial judges and attorneys." *Cummings*, 332 N.C. at 497, 422 S.E.2d at 697; *accord Speller*, 345 N.C. at 605, 481 S.E.2d at 287. If, however, a party requests that the subject matter of a private bench conference be put on the record for appellate review, section 15A-1241(c) requires the trial judge to reconstruct the matter discussed as accurately as possible. *See Cummings*, 332 N.C. at 498, 422 S.E.2d at 698.

In this case, defendant never requested that the subject matter of a bench conference be reconstructed for the record. Thus, the trial court did not err under section 15A-1241 in failing to record its bench conferences with counsel.

We also reject defendant's argument that the unrecorded bench conferences have rendered appellate review impossible. With regard to evidence admitted at trial, we stress that it is the trial court's evidentiary rulings, and not the arguments of counsel during a bench conference, that facilitate effective appellate review. *Cf. Bizzell v. Bizzell*, 237 N.C. 535, 538, 75 S.E.2d 536, 539 (1953). Further, our review of the record reveals that the challenged evidentiary rulings do not thwart our task because the substance of the trial court's rulings is apparent based on the resulting admission of evidence.

[9] We likewise disagree with defendant's assertion that the lack of recordation of the bench conference preceding dismissal of R. Crawford inhibits defendant's ability to argue, or our ability to review, whether defense counsel's failure to make a *Batson* objection constitutes ineffective assistance of counsel.

To successfully assert an ineffective assistance of counsel claim, defendant must satisfy a two-prong test. *See Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693 (1984). First, he must show that counsel's performance fell below an objective standard of reasonableness. *See State v. Braswell*, 312 N.C. 553, 561-62, 324 S.E.2d 241, 248 (1985). Second, once defendant satisfies the first prong, he must show that the error committed was so serious that a reasonable probability exists that the trial result would have been dif-

ferent absent the error. *See Strickland,* 466 U.S. at 691-96, 80 L. Ed. 2d at 696-99. Thus, to establish ineffective assistance of trial counsel, defendant must demonstrate that a *Batson* objection was proper and, further, that his counsel's failure to raise a *Batson* objection fell below an objective standard of reasonableness.

In *Batson,* the United States Supreme Court recognized that the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution forbids the use of peremptory challenges for a racially discriminatory purpose. 476 U.S. at 89, 90 L. Ed. 2d at 82-83; *see White,* 349 N.C. at 547, 508 S.E.2d at 262.

> A three-step process has been established for evaluating claims of racial discrimination in the prosecution's use of peremptory challenges. First, defendant must establish a *prima facie* case that the peremptory challenge was exercised on the basis of race. Second, if such a showing is made, the burden shifts to the prosecutor to offer a racially neutral explanation to rebut defendant's *prima facie* case. Third, the trial court must determine whether the defendant has proven purposeful discrimination.

*Cummings,* 346 N.C. at 307-08, 488 S.E.2d at 560 (citations omitted). Several factors are relevant to the determination of whether a *prima facie* showing of discrimination has been made.

> Those factors include the defendant's race, the victim's race, the race of the key witnesses, questions and statements of the prosecutor which tend to support or refute an inference of discrimination, repeated use of peremptory challenges against blacks such that it tends to establish a pattern of strikes against blacks in the venire, the prosecution's use of a disproportionate number of peremptory challenges to strike black jurors in a single case, and the State's acceptance rate of potential black jurors.

*State v. Quick,* 341 N.C. 141, 145, 462 S.E.2d 186, 189 (1995).

Based on the relevant factors, we note that the transcript of proceedings in the present case contains sufficient information to determine whether a *Batson* objection should have been made and, further, whether defense counsel's failure to raise a *Batson* objection under the circumstances constitutes ineffective assistance of counsel. Therefore, defendant's assertion that appellate review of his ineffective assistance of counsel claim is impossible is without merit.

## STATE v. BLAKENEY

[352 N.C. 287 (2000)]

In short, defendant has not demonstrated that his counsel was ineffective by failing to make a *Batson* objection. Rather, "[d]efendant has shown only that he is black and that the State peremptorily struck one black prospective juror. This is insufficient to establish a *prima facie* case of racial discrimination." *State v. Smith*, 347 N.C. 453, 462, 496 S.E.2d 357, 362, *cert. denied*, 525 U.S. 845, 142 L. Ed. 2d 91 (1998); *accord State v. Hoffman*, 348 N.C. 548, 551, 500 S.E.2d 718, 720-21 (1998).

Our own review of the record does not otherwise reveal any discriminatory intent by the state. None of the questions and statements of the prosecutor support an inference of discrimination. We also note that both defendant and the victim in this case were African-Americans, "thus diminishing the likelihood that 'racial issues [were] inextricably bound up with the conduct of the trial' " *State v. Davis*, 325 N.C. 607, 620, 386 S.E.2d 418, 424 (1989) (quoting *State v. Robbins*, 319 N.C. 465, 491, 356 S.E.2d 279, 295, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987)) (alteration in original), *cert. denied*, 496 U.S. 905, 110 L. Ed. 2d 268 (1990). Because defendant has not demonstrated, and the record does not otherwise reveal, that a *prima facie* case of racial discrimination in jury selection could have been made in this case, counsel's failure to raise a *Batson* objection does not constitute ineffective assistance of counsel.

**[10]** In his next assignment of error, defendant contends the trial court erred in admitting photographs and a videotape of the victim and the crime scene. Defendant argues the photographs and videotape were repetitive, inflammatory, and unfairly prejudicial.

In determining whether to admit photographic evidence, the trial court must weigh the probative value of the photographs against the danger of unfair prejudice to defendant. *See* N.C.G.S. § 8C-1, Rule 403 (1999); *State v. Goode*, 350 N.C. 247, 258, 512 S.E.2d 414, 421 (1999); *State v. Hennis*, 323 N.C. 279, 283, 372 S.E.2d 523, 526 (1988). "This determination lies within the sound discretion of the trial court, and the trial court's ruling should not be overturned on appeal unless the ruling was 'manifestly unsupported by reason or [was] so arbitrary that it could not have been the result of a reasoned decision.' " *Goode*, 350 N.C. at 258, 512 S.E.2d at 421 (quoting *Hennis*, 323 N.C. at 285, 372 S.E.2d at 527) (alteration in original).

"Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repe-

titious use is not aimed solely at arousing the passions of the jury." *Hennis*, 323 N.C. at 284, 372 S.E.2d at 526; *accord State v. Gregory*, 340 N.C. 365, 387, 459 S.E.2d 638, 650 (1995), *cert. denied*, 517 U.S. 1108, 134 L. Ed. 2d 478 (1996). Photographs may also be admitted into evidence " 'to illustrate testimony regarding the manner of killing so as to prove circumstantially the elements of murder in the first degree.' " *State v. Thomas*, 344 N.C. 639, 647, 477 S.E.2d 450, 453-54 (1996) (quoting *State v. Rose*, 335 N.C. 301, 319, 439 S.E.2d 518, 528, *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 883 (1994)), *cert. denied*, 522 U.S. 824, 139 L. Ed. 2d 41 (1997). " 'Even where a body is in advanced stages of decomposition and the cause of death and identity of the victim are uncontroverted, photographs may be exhibited showing the condition of the body and its location when found.' " *Gregory*, 340 N.C. at 387, 459 S.E.2d at 650-51 (quoting *State v. Wynne*, 329 N.C. 507, 517, 406 S.E.2d 812, 816-17 (1991)). These same basic principles govern the admissibility of videotapes. *See State v. Strickland*, 276 N.C. 253, 258, 173 S.E.2d 129, 132 (1970).

In the present case, the record does not demonstrate that the challenged photographs and videotape of the victim were used excessively and solely to inflame the passions and prejudices of the jury. The trial court carefully reviewed the challenged photographs and videotape, attentively considered the objections and arguments of counsel, and excluded photographs and portions of the videotape that it found to be repetitive and nonprobative. Our review of the record reveals that each photograph at issue illustrated, in some unique respect, the manner in which the victim was killed, including depiction of electrical wire used to bind the victim at the wrists, knees, and ankles. Likewise, the videotape uniquely depicted the condition and location of the victim's body in the context of the crime scene. Further, the challenged photographs and videotape illustrated the testimony of SBI Special Agent Bobby Bonds, who conducted the crime scene search. The autopsy photographs at issue similarly illustrated the testimony of Dr. Robert Thompson, the forensic pathologist who performed the autopsy on the victim's body. Therefore, we cannot say that the trial court abused its discretion by admitting the challenged evidence. This assignment of error is without merit.

[11] By his next assignment of error, defendant contends the trial court erred in admitting the testimony of SBI Agent Shaw that the burning of the victim's home was of incendiary origin. Defendant argues that Agent Shaw was not qualified to render an opinion on this subject and that his opinion was not of assistance to the jury.

## STATE v. BLAKENEY

[352 N.C. 287 (2000)]

A witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if his or her specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. *See* N.C.G.S. § 8C-1, Rule 702 (1999). This Court has previously held that a properly qualified arson expert may offer opinion testimony that a fire was set intentionally. *See State v. Hales*, 344 N.C. 419, 424, 474 S.E.2d 328, 331 (1996); *State v. Eason*, 328 N.C. 409, 421-22, 402 S.E.2d 809, 815 (1991). In both *Hales* and *Eason*, we noted that the experts had testified as to the matters upon which their opinions were based. *See Hales*, 344 N.C. at 425, 474 S.E.2d at 331; *Eason*, 328 N.C. at 422, 402 S.E.2d at 815. Moreover, in *Hales* we stated that the expert's testimony regarding the basis for his opinion "was in regard to matters not within the knowledge of the average person, and it was helpful to the jury in reaching a decision." 344 N.C. at 425, 474 S.E.2d at 331.

In the instant case, Agent Shaw testified that he is an arson investigator for the SBI, responsible for the determination of the cause and origin of fires, and that he has held that position for over two years. Agent Shaw has attended over five hundred hours of arson investigation courses and has attended numerous seminars organized by the International Association of Arson Investigators. He has also been certified as a fire investigator by the North Carolina Fire and Rescue Commission, and has taught classes on arson. Agent Shaw also testified that he has participated in approximately 125 to 135 arson investigations. After *voir dire* by defendant, the trial court accepted Agent Shaw as "an expert in the area of the cause or origin determination of fires."

Like the experts in *Hales* and *Eason*, Agent Shaw stated his opinion and testified as to the matters upon which he based his opinion. During direct examination, Agent Shaw testified that his investigation revealed that the fire had two distinct points of origin. Agent Shaw noted evidence of "low burning," including several "ignitable liquid pour patterns" on the floor, which indicated to him that an ignitable liquid had been poured, then set on fire. Agent Shaw also testified that he had eliminated all accidental causes or other natural phenomena such as lightning. Based on these and other observations, Agent Shaw testified that, in his opinion, "the fire that had occurred at this residence was an incendiary or set fire."

After careful review of the record, we conclude the trial court did not err in determining that Agent Shaw had sufficient knowledge to

form an opinion that the fire was intentionally set. We likewise believe that the testimony of Agent Shaw "was in regard to matters not within the knowledge of the average person, and it was helpful to the jury." *Id.* Accordingly, this assignment of error fails.

**[12]** In his next assignment of error, defendant contends the trial court erred by denying his motion to dismiss the charge of first-degree murder. Specifically, defendant argues that N.C.G.S. § 15A-2000, as interpreted by this Court, conflicts with Article IV, Section 18 of the North Carolina Constitution in that it interferes with the district attorney's constitutional responsibility to prosecute.

Under Article IV, Section 18 of the North Carolina Constitution, "[t]he District Attorney shall . . . be responsible for the prosecution on behalf of the State of all criminal actions in the Superior Courts of his district." Although the district attorney has broad discretion in a homicide case to determine whether to try a defendant for first-degree murder, second-degree murder, or manslaughter, see *State v. Wallace*, 345 N.C. 462, 468, 480 S.E.2d 673, 677 (1997), the district attorney does not have the discretion to determine whether to try a defendant capitally or noncapitally for first-degree murder. *See* N.C.G.S. § 15A-2000 (1999); *State v. Rorie*, 348 N.C. 266, 270-71, 500 S.E.2d 77, 80 (1998); *State v. Britt*, 320 N.C. 705, 710, 360 S.E.2d 660, 662 (1987).

Put simply, this statutory limitation on prosecutorial discretion does not impermissibly conflict with the prosecutor's constitutional duty to prosecute criminal actions on behalf of the state. Therefore, defendant's argument fails.

**[13]** We likewise reject defendant's argument that N.C.G.S. § 15A-2000 is otherwise unconstitutional because the district attorney has the discretion, in a homicide case, to determine whether to try a defendant for first-degree murder or a lesser homicide crime. The exercise of prosecutorial discretion does not invalidate the death penalty. *See McCleskey v. Kemp*, 481 U.S. 279, 307, 313, 95 L. Ed. 2d 262, 288, 292 (1987); *Proffitt v. Florida*, 428 U.S. 242, 254, 49 L. Ed. 2d 913, 924 (1976). " 'This Court has consistently recognized that a system of capital punishment is not rendered unconstitutional simply because the prosecutor is granted broad discretion.' " *State v. Lineberger*, 342 N.C. 599, 603, 467 S.E.2d 24, 26 (1996) (quoting *State v. Garner*, 340 N.C. 573, 588, 459 S.E.2d 718, 725 (1995), *cert. denied*, 516 U.S. 1129, 133 L. Ed. 2d 872 (1996)). We have likewise recognized

"that there may be selectivity in prosecutions and that the exercise of this prosecutorial prerogative does not reach constitutional proportion unless there be a showing that selection was deliberately based upon 'an unjustifiable standard such as race, religion or other arbitrary classification.' [*Oyler v. Boles*, 368 U.S. 448, 456, 7 L. Ed. 2d 446, 453 (1962).]"

*State v. Lawson*, 310 N.C. 632, 644, 314 S.E.2d 493, 501 (1984) (quoting *State v. Cherry*, 298 N.C. 86, 103, 257 S.E.2d 551, 562 (1979), *cert. denied*, 446 U.S. 941, 64 L. Ed. 2d 796 (1980)), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985).

In the present case, there is no evidence, nor has defendant argued, that the district attorney's decision to prosecute defendant for first-degree murder was based on any improper factor such as race, religion, or other arbitrary classification. Accordingly, this assignment of error is rejected.

**[14]** By his next assignment of error, defendant contends the trial court committed plain error by instructing the jury that it could rely on various circumstances surrounding the murder to infer premeditation and deliberation. Defendant argues that the circumstances described by the trial court were not all supported by the evidence in this case and served only to reemphasize the grotesque effect the fire had upon the victim's body after death.

Defendant did not object to the trial court's instructions at trial. He thus failed to preserve this issue for appellate review. *See* N.C. R. App. P. 10(b)(2). The instructions are therefore only reviewed for plain error. *See State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983). "In order to rise to the level of plain error, the error in the trial court's instructions must be so fundamental that (i) absent the error, the jury probably would have reached a different verdict; or (ii) the error would constitute a miscarriage of justice if not corrected." *State v. Holden*, 346 N.C. 404, 435, 488 S.E.2d 514, 531 (1997), *cert. denied*, 522 U.S. 1126, 140 L. Ed. 2d 132 (1998).

The trial court instructed the jury on premeditation and deliberation as follows:

Now, neither premeditation nor deliberation is usually susceptible of direct proof. They may be proved by proof of circumstances from which they may be inferred, such as the conduct of the defendant before, during and after the killing, the use of grossly excessive force, the infliction of lethal wounds after the

victim is felled, the brutal or vicious circumstances of the killing, and the manner in which or means by which the killing was done.

This instruction is based upon the North Carolina pattern jury instructions. N.C.P.I.—Crim. 206.10 (1998). This Court has previously found no error in jury instructions on premeditation and deliberation that were nearly identical to the instruction given in this case and has rejected very similar arguments. *See, e.g., State v. Crawford,* 344 N.C. 65, 78, 472 S.E.2d 920, 928 (1996); *State v. Leach,* 340 N.C. 236, 241-42, 456 S.E.2d 785, 788-89 (1995); *State v. Weathers,* 339 N.C. 441, 454-55, 451 S.E.2d 266, 273 (1994). We have said that " 'the elements listed [in this pattern jury instruction] are merely examples of circumstances which, if found, the jury could use to infer premeditation and deliberation. It is not required that each of the listed elements be proven beyond a reasonable doubt before the jury may infer premeditation and deliberation.' " *Weathers,* 339 N.C. at 454, 451 S.E.2d at 273 (quoting *State v. Cummings,* 326 N.C. 298, 315, 389 S.E.2d 66, 76 (1990)). Thus, in *State v. Leach,* we held that "the trial court did not err by giving the instruction at issue here, even in the absence of evidence to support each of the circumstances listed." 340 N.C. at 242, 456 S.E.2d at 789.

Likewise, in the instant case, the trial court did not err by giving the challenged instruction. This assignment of error is rejected.

[15] In his next assignment of error, defendant contends the trial court erred in instructing the jury that it could consider his flight from the scene as evidence of guilt. The trial court gave the pattern jury instruction on flight. N.C.P.I.—Crim. 104.36 (1994). Defendant argues there was insufficient evidence of flight to warrant the trial court's instruction.

This Court has held that an instruction on flight is justified if there is " 'some evidence in the record reasonably supporting the theory that the defendant fled after the commission of the crime charged.' " *State v. Allen,* 346 N.C. 731, 741, 488 S.E.2d 188, 193 (1997) (quoting *Fisher,* 336 N.C. at 706, 445 S.E.2d at 878); *accord State v. Johnson,* 341 N.C. 104, 113, 459 S.E.2d 246, 251 (1995). "Mere evidence that defendant left the scene of the crime is not enough to support an instruction on flight. There must also be some evidence that defendant took steps to avoid apprehension." *State v. Thompson,* 328 N.C. 477, 490, 402 S.E.2d 386, 392 (1991).

In the present case, defendant telephoned his wife from his mother's residence, before the victim arrived, and informed her he would be home "in a few minutes." The record reveals, however, that defendant did not return home as planned. Rather, defendant ran from the scene of the crime and departed the area in his vehicle. One of defendant's longstanding friends waved at him, but defendant did not respond. After departing the area, defendant drove to "[Emanuel Blackman's] shack out in the country," where he traded the victim's gun for cocaine and twenty dollars in cash. Defendant then continued to drive through the country, stopping in Pageland, South Carolina, where he traded more stolen items for drugs. Rather than return home, as originally intended, defendant then went to Kenneth Funderburk's house and remained there overnight. Law enforcement officers apprehended defendant at this residence the next afternoon.

The evidence presented in the present case, when considered in the light most favorable to the state, was more than sufficient to warrant the trial court's instruction on flight. This assignment of error is overruled.

## CAPITAL SENTENCING

**[16]** By his next assignment of error, defendant contends the trial court erred in denying his motion to exclude testimonial and photographic evidence concerning his prior conviction for armed robbery. The challenged evidence was proffered by the state to prove the existence of the aggravating circumstance that defendant had previously been convicted of a felony involving violence to another person. *See* N.C.G.S. § 15A-2000(e)(3). The photograph at issue depicted blood in the victim's grocery store, which resulted from a head injury defendant inflicted on the victim when he struck him with a gun during the robbery. Defendant argues that the probative value of the challenged evidence was outweighed by its prejudice to defendant. *See* N.C.G.S. § 8C-1, Rule 403.

At the outset, we note the Rules of Evidence do not apply in capital sentencing proceedings. *See* N.C.G.S. § 8C-1, Rule 1101(b)(3) (1999). The trial court, therefore, has "great discretion to admit any evidence relevant to sentencing." *State v. Thomas,* 350 N.C. 315, 359, 514 S.E.2d 486, 513, *cert. denied,* —— U.S. ——, 145 L. Ed. 2d 388 (1999); *accord State v. Warren,* 348 N.C. 80, 123, 499 S.E.2d 431, 455, *cert. denied,* 525 U.S. 915, 142 L. Ed. 2d 216 (1998); *State v. Heatwole,* 344 N.C. 1, 25, 473 S.E.2d 310, 322 (1996), *cert. denied,* 520 U.S. 1122,

137 L. Ed. 2d 339 (1997). "The State must be allowed to present any competent evidence in support of the death penalty, including 'evidence of the circumstances surrounding a defendant's prior felony, notwithstanding the defendant's stipulation to the record of conviction, to support the existence of aggravating circumstances.' " *Warren*, 348 N.C. at 123, 499 S.E.2d at 455 (quoting *State v. Warren*, 347 N.C. 309, 316, 492 S.E.2d 609, 612 (1997), *cert. denied*, 523 U.S. 1109, 140 L. Ed. 2d 818 (1998)) (citation omitted). The graphic nature of the evidence does not make it inadmissible. *See State v. Moseley*, 336 N.C. 710, 720, 445 S.E.2d 906, 912 (1994), *cert. denied*, 513 U.S. 1120, 130 L. Ed. 2d 802 (1995). Moreover, the determination of whether photographic evidence is more probative than prejudicial is within the trial court's discretion. *See Heatwole*, 344 N.C. at 25, 473 S.E.2d at 322.

In this case, the grocery store photograph illustrated the testimony of the victim of defendant's prior violent felony. Both the photograph and the accompanying testimony were relevant to support the existence of the (e)(3) aggravating circumstance, that defendant had been previously convicted of a felony involving the use of violence to the person. *See* N.C.G.S. § 15A-2000(e)(3). In any event, defendant has failed to demonstrate that the trial court abused its discretion by admitting the challenged photograph. Accordingly, this assignment of error fails.

**[17]** In another assignment of error, defendant contends the trial court erred in denying his request to submit to the jury an instruction on the nonstatutory mitigating circumstance that "the defendant did not set out to kill Callie Huntley."

Defendant initially requested that the trial court submit the following nonstatutory mitigating circumstance: "The circumstances of the case in that the defendant did not set out to kill Callie Huntley and attempted to leave the house several times before the lethal acts occurred." The trial court determined not to submit the first half of defendant's proposed instruction but did allow submission of the nonstatutory mitigating circumstance that "[t]he defendant attempted to leave the house several times before the lethal acts occurred."

To demonstrate that the trial court erred by refusing to submit a requested nonstatutory mitigating circumstance, defendant must establish that "(1) the nonstatutory mitigating circumstance is one which the jury could reasonably find had mitigating value, and (2)

there is sufficient evidence of the existence of the circumstance to require it to be submitted to the jury." *State v. Benson*, 323 N.C. 318, 325, 372 S.E.2d 517, 521 (1988); *accord State v. Cummings*, 326 N.C. 298, 324, 389 S.E.2d 66, 80 (1990).

In *State v. Green*, 336 N.C. 142, 443 S.E.2d 14, *cert. denied*, 513 U.S. 1046, 130 L. Ed. 2d 547 (1994), this Court determined that the trial court erred when it refused to submit as a possible nonstatutory mitigating circumstance that "the defendant did not intend to take the life of Sheila Bland or John Michael Edmondson when he entered Young's Cleaners." *Id.* at 185, 443 S.E.2d at 39. We explained that self-serving portions of the defendant's statement to authorities, although controverted by most of the evidence of record, tended to support the requested circumstance, and that a reasonable juror could find such a circumstance to be mitigating. *Id.* Nonetheless, we determined in *Green* that certain submitted mitigating circumstances as well as the catchall mitigating circumstance provided a vehicle for the jury to consider all the evidence tending to support the nonstatutory mitigating circumstance that was not submitted. *Id.*; *see State v. Bishop*, 343 N.C. 518, 549, 472 S.E.2d 842, 858-59 (1996), *cert. denied*, 519 U.S. 1097, 136 L. Ed. 2d 723 (1997); *State v. Frye*, 341 N.C. 470, 504-05, 461 S.E.2d 664, 682 (1995), *cert. denied*, 517 U.S. 1123, 134 L. Ed. 2d 526 (1996). Therefore, we held in *Green* that the trial court's error was harmless beyond a reasonable doubt because it was clear that the jury was not prevented from considering any potential mitigating evidence. 336 N.C. at 185-86, 443 S.E.2d at 39; *accord State v. Hartman*, 344 N.C. 445, 470, 476 S.E.2d 328, 342 (1996), *cert. denied*, 520 U.S. 1201, 137 L. Ed. 2d 708 (1997); *State v. Hill*, 331 N.C. 387, 417, 417 S.E.2d 765, 780 (1992), *cert. denied*, 507 U.S. 924, 122 L. Ed. 2d 684 (1993).

Likewise, in the present case, self-serving portions of defendant's statement to authorities tended to support his requested mitigating circumstance. Moreover, a reasonable juror could find the proposed circumstance to have mitigating value. Therefore, the trial court erred by refusing to submit the circumstance for the jury's consideration.

As in *Green*, however, the trial court's error in this case did not preclude any juror from considering and giving weight to any mitigating evidence underlying defendant's proposed circumstance. Defendant's complete statement, upon which the proposed circumstance was based, was read to the jury. Furthermore, the record reveals that the evidence underlying the requested circumstance was

fully argued to the jury by defense counsel during closing argument. Finally, the trial court submitted the catchall mitigating circumstance to the jury. *See* N.C.G.S. § 15A-2000(f)(9). Therefore, the trial court's error was harmless beyond a reasonable doubt. *See* N.C.G.S. § 15A-1443(b) (1999).

[18] By defendant's next assignment of error, he contends the trial court erred by submitting the (f)(1) statutory mitigating circumstance: "The defendant has no significant history of prior criminal activity." N.C.G.S. § 15A-2000(f)(1). Defendant argues the evidence does not support a conclusion that his criminal history was insignificant. He also contends the trial court erred by submitting the (f)(1) mitigating circumstance after having submitted the (e)(3) aggravating circumstance: "The defendant had been previously convicted of a felony involving the use or threat of violence to the person . . . ." N.C.G.S. § 15A-2000(e)(3).

The statute governing capital sentencing proceedings requires that:

> In all cases in which the death penalty may be authorized, the judge *shall include* in his instructions to the jury that it must consider any aggravating circumstance or circumstances or mitigating circumstance or circumstances from the lists provided in subsections (e) and (f) which may be supported by the evidence . . . .

N.C.G.S. § 15A-2000(b) (emphasis added). Construing subsection 15A-2000(b), this Court has stated that the test governing the trial court's decision to submit the (f)(1) mitigator is "whether a rational jury could conclude that defendant had no *significant* history of prior criminal activity." *State v. Wilson*, 322 N.C. 117, 143, 367 S.E.2d 589, 604 (1988); *accord State v. White*, 343 N.C. 378, 394-95, 471 S.E.2d 593, 602-03, *cert. denied*, 519 U.S. 936, 136 L. Ed. 2d 229 (1996); *Smith*, 347 N.C. at 469, 496 S.E.2d at 366. If the trial court determines that a rational jury could so conclude, "the trial court has no discretion; the trial court must submit the statutory mitigating circumstance to the jury without regard to the State's or the defendant's wishes." *State v. Parker*, 350 N.C. 411, 436, 516 S.E.2d 106, 123 (1999), *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 681 (2000); *accord Smith*, 347 N.C. at 469, 496 S.E.2d at 366; *State v. Mahaley*, 332 N.C. 583, 597, 423 S.E.2d 58, 66 (1992), *cert. denied*, 513 U.S. 1089, 130 L. Ed. 2d 649 (1995).

In determining whether a defendant's history is "significant" under section 15A-2000(f)(1), "the [trial court's] focus should be on whether the criminal activity is such as to influence the jury's sentencing recommendation." *State v. Greene*, 351 N.C. 562, ——, 528 S.E.2d 575, 580 (2000); *accord State v. Williams*, 350 N.C. 1, 11, 510 S.E.2d 626, 633, *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 162 (1999); *Parker*, 350 N.C. at 436, 516 S.E.2d at 123.

During the sentencing proceeding in this case, the state presented evidence of, and defendant stipulated to, one conviction for robbery with a dangerous weapon. The state's evidence tended to show that, in 1989, defendant robbed a grocery store and struck the store owner in the back of the head with a gun. Evidence at trial also indicated that defendant had a history of drug abuse.

Based on this evidence, the trial court properly determined that a rational jury could conclude that defendant had no significant history of criminal activity and, therefore, that defendant's history could influence the jury's sentencing recommendation as a mitigating circumstance. *See Greene*, 351 N.C. at ——, 528 S.E.2d at 580-81. Therefore, defendant's argument is without merit.

[19] We likewise reject defendant's argument that the trial court erred by submitting the (f)(1) mitigating circumstance after having submitted the (e)(3) aggravating circumstance. This Court has repeatedly upheld submission of the (f)(1) mitigating circumstance in cases where the (e)(3) aggravating circumstance was submitted to the jury. *See, e.g., State v. Ball*, 344 N.C. 290, 311, 313, 474 S.E.2d 345, 357, 359 (1996), *cert. denied*, 520 U.S. 1180, 137 L. Ed. 2d 561 (1997); *State v. Walker*, 343 N.C. 216, 224-26, 469 S.E.2d 919, 923-24, *cert. denied*, 519 U.S. 901, 136 L. Ed. 2d 180 (1996); *State v. Brown*, 315 N.C. 40, 61-63, 337 S.E.2d 808, 824-25 (1985), *cert. denied*, 476 U.S. 1164, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988). Therefore, defendant has failed to demonstrate that the trial court erred by submitting the (f)(1) mitigating circumstance to the jury. Accordingly, this assignment of error fails.

[20] In another assignment of error, defendant contends the trial court erred by instructing that the jury must be unanimous in its recommendation of a sentence of life and by prohibiting defendant from informing the jury that a life sentence would be imposed if the jury was not unanimous.

The state filed a pretrial motion asking the trial court to prohibit defendant from arguing to the jury during the penalty phase of trial that the failure of the jury to unanimously agree on punishment would result in life imprisonment. The trial court granted the state's motion. Thereafter, the trial court instructed prospective jurors as follows:

> If the jury unanimously recommends that the defendant be sentenced to death, I will be required by the law of this state to impose a sentence of death. If you unanimously recommend a sentence of life imprisonment, I will be required by that same law to impose a punishment of imprisonment in the state's prison for life without parole.

The trial court's statement to prospective jurors is in accord with N.C.G.S. § 15A-2002. *See Smith*, 351 N.C. at 270, 524 S.E.2d at 42. Moreover, this Court has repeatedly held that it is improper for a trial court to inform the jury of the effect of its failure to reach a unanimous verdict. *See State v. Jones*, 339 N.C. 114, 137, 451 S.E.2d 826, 837 (1994), *cert. denied*, 515 U.S. 1169, 132 L. Ed. 2d 873 (1995); *State v. Hutchins*, 303 N.C. 321, 353, 279 S.E.2d 788, 807 (1981); *State v. Johnson*, 298 N.C. 355, 369-70, 259 S.E.2d 752, 761-62 (1979). "Such an instruction is improper because it permits the jury to escape its responsibility to recommend the sentence to be imposed." *Jones*, 339 N.C. at 137, 451 S.E.2d at 837. Accordingly, this assignment of error must fail.

**[21]** In his next assignment of error, defendant argues the trial court failed to intervene *ex mero motu* to preclude the prosecutor from making false and improper statements to the jury during closing arguments. The statements at issue pertained to Dr. Mark Worthen (Dr. Worthen), a clinical psychologist who testified for defendant during the capital sentencing proceeding.

When, as here, defendant fails to object during closing argument, the standard of review is whether the argument was so grossly improper that the trial court erred in failing to intervene *ex mero motu*. *See State v. Trull*, 349 N.C. 428, 451, 509 S.E.2d 178, 193 (1998), *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 80 (1999). " '[T]he trial court is not required to intervene *ex mero motu* unless the argument strays so far from the bounds of propriety as to impede defendant's right to a fair trial.' " *State v. McNeil*, 350 N.C. 657, 684, 518 S.E.2d 486, 503 (1999) (quoting *Atkins*, 349 N.C. at 84, 505 S.E.2d at 111), *cert. denied*, —— U.S. ——, 146 L. Ed. 2d 321 (2000). " '[O]nly an extreme

impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken.' " *State v. Fletcher*, 348 N.C. 292, 322, 500 S.E.2d 668, 685 (1998) (quoting *State v. Richardson*, 342 N.C. 772, 786, 467 S.E.2d 685, 693, *cert. denied*, 519 U.S. 890, 136 L. Ed. 2d 160 (1996)), *cert. denied*, 525 U.S. 1180, 143 L. Ed. 2d 113 (1999).

In a capital sentencing proceeding, trial counsel are allowed wide latitude in their argument to the jury. *See Smith*, 351 N.C. at 268, 524 S.E.2d at 41; *State v. Robinson*, 346 N.C. 586, 606, 488 S.E.2d 174, 187 (1997). Counsel may argue the facts in evidence as well as all reasonable inferences that may be drawn therefrom. *See State v. Guevara*, 349 N.C. 243, 257, 506 S.E.2d 711, 721 (1998), *cert. denied*, 526 U.S. 1133, 143 L. Ed. 2d 1013 (1999); *Warren*, 348 N.C. at 124, 499 S.E.2d at 456. Counsel may not, however, "travel outside the record by interjecting facts of their own knowledge or other facts not included in the evidence." *State v. Syriani*, 333 N.C. 350, 398, 428 S.E.2d 118, 144, *cert. denied*, 510 U.S. 948, 126 L. Ed. 2d 341 (1993).

Defendant first argues the prosecutor falsely informed the jury that Dr. Worthen brought only the answers to questions that he wanted the jury to hear. The prosecutor stated in pertinent part:

He didn't bring you this four hundred and eighty some questions that he put to this defendant. He only brought the ones that he chose to bring, so you don't know what those questions were or what the answers were that this defendant gave. He chose to leave those at home.

The record reveals conflicting answers from Dr. Worthen as to whether all of the questions posed to defendant were included in his report. Initially, Dr. Worthen testified that only 85 of 566 questions and answers were in his report. The following exchange occurred:

[PROSECUTOR]: So you don't have the questions and the specific answers to the other four hundred and eighty questions, do you?

[DR. WORTHEN]: Yes. I apologize, that is correct.

. . . .

[PROSECUTOR]: So you have no way of being able to tell this jury what this defendant's response was to Question Number 41, "I do not always tell the truth", do you?

[DR. WORTHEN]: Unless it's in here, no.

After further questioning, however, Dr. Worthen remembered that all of the answers to the questions were on the last page of his report. The record reveals that the prosecutor held a copy of the "Diagnostic and Statistical Manual for Mental Disorders and Mental Diseases" (DSM) as he questioned Dr. Worthen. The DSM was the source of Dr. Worthen's questions to defendant. The prosecutor apparently asked questions from his copy of the manual, and Dr. Worthen responded from the answer sheet on the last page of his report. It appears from the record, then, that Dr. Worthen's report contained only eighty-five questions from the DSM, but all of defendant's answers. Therefore, the prosecutor did not travel outside the record. Even if improper, the prosecutor's argument was not so "grossly improper" as to require the trial court to intervene *ex mero motu. See State v. Gladden*, 315 N.C. 398, 424, 340 S.E.2d 673, 689 (prosecutor's factual argument, though not supported by the evidence, was not so grossly improper as to warrant *ex mero motu* action by the trial court), *cert. denied*, 479 U.S. 871, 93 L. Ed. 2d 166 (1986).

[22] Defendant next argues the prosecutor improperly argued that Dr. Worthen prepared his report at the last moment solely to surprise the prosecution unfairly. The prosecutor argued as follows:

He prepares a report only at the very last minute, the night before he testifies. We would argue and contend to you it's so that we wouldn't have an opportunity to be able to fairly question him about it, point out the real motive.

The record reveals that Dr. Worthen testified that his final report was not completed until the previous day. The trial court had previously ordered that the report be turned over to the state by the end of the state's case-in-chief. The report was not turned over, however, until after the conclusion of the guilt-innocence phase of trial. Therefore, the prosecutor's argument concerning Dr. Worthen's motive was a permissible inference based on the evidence and was not grossly improper. Accordingly, the trial court did not err in failing to intervene *ex mero motu.*

**STATE v. BLAKENEY**

[352 N.C. 287 (2000)]

Defendant further argues the prosecutor improperly suggested to the jury that defense counsel had prepared Dr. Worthen's report. The prosecutor commented as follows:

> And actually the report was prepared by Mr. Blakeney's lawyers. How fair is that? How fair is that, members of the jury? We ask you to carefully consider what he said.

In response to questions by the prosecutor, Dr. Worthen testified that he dictated the report and sent the dictation tapes to defense counsel for them to type. Based on this testimony, we conclude the prosecutor's argument was grounded upon facts in the record and was not so "grossly improper" as to require action by the trial court *ex mero motu*.

Finally, defendant argues the prosecutor's assertion that Dr. Worthen took his diagnosis out of the DSM was unfair and not based on the testimony. The prosecutor argued in pertinent part as follows:

> He's here to take a diagnosis out of a manual that he agreed with me had a cautionary statement at the beginning that says it shouldn't be used in any context other than treatment setting, use great caution in diagnosing from this manual for a legal setting. He diagnosed from it anyway.

Dr. Worthen testified that he relied, in part, on the DSM to diagnose defendant. He further testified that the DSM is "the main manual that is used to provide official diagnosis." Moreover, Dr. Worthen conceded that the DSM contains the following cautionary statement: "The clinical and the scientific considerations involved in characterizations for these conditions as mental disorders may not be wholly relevant to legal judgments." Thus, the prosecutor's argument was not so grossly improper as to require the trial court to intervene *ex mero motu*.

## PRESERVATION

Defendant raises eight additional issues for the purpose of permitting this Court to reexamine its prior holdings and also for the purpose of preserving these issues for any possible further judicial review: (1) the North Carolina death penalty statute is unconstitutional; (2) the trial court erred by instructing the jury concerning the unanimity requirement in various jury decisions; (3) the trial court

erred by instructing the jury that it had a "duty" to recommend a sentence of death if it determined that the mitigating circumstances found were insufficient to outweigh the aggravating circumstances and that the aggravating circumstances were sufficiently substantial to warrant the imposition of the death penalty; (4) the trial court erred by denying defendant's motions for a bill of particulars seeking information from the state regarding aggravating and mitigating circumstances; (5) the trial court erred by denying defendant's motions to increase the number of peremptory challenges; (6) the trial court erred by denying defendant's pretrial motion for disclosure of the names of the state's witnesses to whom defendant made statements; (7) the trial court erred by denying defendant's motion for separate juries for the guilt-innocence phase and the capital sentencing proceeding; and (8) the trial court erred by submitting the aggravating circumstance that the crime was especially heinous, atrocious, or cruel.

We have considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. Therefore, we reject these assignments of error.

## PROPORTIONALITY REVIEW

[23] Having concluded that defendant's trial and capital sentencing proceeding were free of prejudicial error, we are required to review and determine: (1) whether the record supports the jury's finding of any aggravating circumstances upon which the sentencing court based its sentence of death; (2) whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2).

In the present case, defendant was convicted of first-degree murder on the basis of malice, premeditation, and deliberation and under the felony murder rule. The jury found four aggravating circumstances: (1) defendant had been previously convicted of a felony involving the use of violence to the person, N.C.G.S. § 15A-2000(e)(3); (2) the murder was committed while defendant was engaged in the commission of first-degree arson, N.C.G.S. § 15A-2000(e)(5); (3) the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6); and (4) the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9).

Of the eight mitigating circumstances submitted, one or more jurors found the following: (1) defendant grew up in very unfortunate and difficult circumstances in that he grew up in a physical and psychological environment which significantly retarded the proper development of his character and functional abilities; (2) defendant's father was absent from the home since defendant was two or three years old; and (3) defendant's mother was in and out of the home and involved in an alcoholic and verbally and sometimes physically abusive relationship with Mr. Huntley, the victim here, which the defendant witnessed.

After thoroughly examining the record, transcript, and briefs in this case, we conclude the evidence fully supports the aggravating circumstances found by the jury. Further, there is no indication that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary consideration. We turn now to our final statutory duty of proportionality review.

In conducting our proportionality review, it is proper to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate. *See State v. McCollum,* 334 N.C. 208, 240, 433 S.E.2d 144, 162 (1993), *cert. denied,* 512 U.S. 1254, 129 L. Ed. 2d 895 (1994). One purpose of our proportionality review " 'is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury.' " *Atkins,* 349 N.C. at 114, 505 S.E.2d at 129 (quoting *State v. Holden,* 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied,* 486 U.S. 1061, 100 L. Ed. 2d 935 (1988)). We have found the death penalty disproportionate in seven cases. *See State v. Benson,* 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes,* 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers,* 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Gaines,* 345 N.C. 647, 483 S.E.2d 396, *cert. denied,* 522 U.S. 900, 139 L. Ed. 2d 177 (1997), *and by State v. Vandiver,* 321 N.C. 570, 364 S.E.2d 373; *State v. Young,* 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill,* 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant,* 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson,* 309 N.C. 26, 305 S.E.2d 703 (1983).

We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate. Defendant was convicted of first-degree murder on the basis of malice, premeditation, and deliberation. This Court has held that "a finding of premeditation and deliberation indicates 'a more calculated

and cold-blooded crime.' " *State v. Harris*, 338 N.C. 129, 161, 449 S.E.2d 371, 387 (1994) (quoting *State v. Lee*, 335 N.C. 244, 297, 439 S.E.2d 547, 575, *cert. denied*, 513 U.S. 891, 130 L. Ed. 2d 162 (1994)), *cert. denied*, 514 U.S. 1100, 131 L. Ed. 2d 752 (1995). Moreover, the jury's finding of the (e)(3) aggravating circumstance, prior conviction of a violent felony, is particularly significant because none of the cases in which this Court has held the death sentence to be disproportionate have included this aggravating circumstance. *See State v. Peterson*, 350 N.C. 518, 538, 516 S.E.2d 131, 143-44 (1999), *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 1087 (2000); *State v. Murillo*, 349 N.C. 573, 613, 509 S.E.2d 752, 775 (1998), *cert. denied*, —— U.S. ——, 145 L. Ed. 2d 87 (1999); *Harris*, 338 N.C. at 161, 449 S.E.2d at 387; *State v. Rose*, 335 N.C. 301, 351, 439 S.E.2d 518, 546, *cert. denied*, 512 U.S. 1246, 129 L. Ed. 2d 883 (1994).

We also compare the present case with cases in which this Court has found the death penalty to be proportionate. *See McCollum*, 334 N.C. at 244, 433 S.E.2d at 164. Although this Court considers all the cases in the pool of similar cases when engaging in proportionality review, "we will not undertake to discuss or cite all of those cases each time we carry out the duty." *Id.*; *accord State v. Gregory*, 348 N.C. 203, 213, 499 S.E.2d 753, 760, *cert. denied*, 525 U.S. 952, 142 L. Ed. 2d 315 (1998).

There are four statutory aggravating circumstances which, standing alone, this Court has held sufficient to sustain a death sentence. *See Warren*, 347 N.C. at 328, 492 S.E.2d at 619. The (e)(3), (e)(5), and (e)(9) aggravating circumstances, which the jury found here, are among them. *See State v. Bacon*, 337 N.C. 66, 110 n.8, 446 S.E.2d 542, 566 n.8 (1994), *cert. denied*, 513 U.S. 1159, 130 L. Ed. 2d 1083 (1995). Thus, we conclude that the present case is more similar to cases in which we have found a sentence of death proportionate than to those in which we have found a sentence of death disproportionate.

Whether a sentence of death is "disproportionate in a particular case ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *Green*, 336 N.C. at 198, 443 S.E.2d at 47. Therefore, based upon the characteristics of this defendant and the crime he committed, we are convinced that the sentence of death recommended by the jury and ordered by the trial court in the instant case is not disproportionate.

Based on the foregoing, we hold that defendant received a fair trial, free of prejudicial error. The judgments and sentences entered

by the trial court, including the sentence of death for first-degree murder, must therefore be left undisturbed.

NO ERROR.